FILED

2014 Mar-18  PM 03:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., as Indenture Trustee, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 2:11-cv-01509-TMP |
| SALEM NURSING & REHAB CENTER OF REFORM, INC., THE MEDICAL CLINIC BOARD OF THE CITY OF REFORM, ALABAMA, and ALTACARE CORPORATION, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This case is before the court on the Motion for Summary Judgment (doc. 43), filed January 4, 2013, by The Bank of New York Mellon Trust Company ("Plaintiff"), as successor Indenture Trustee, on behalf of bondholders.  Plaintiff's claim arises from alleged defaults by defendants Salem Nursing & Rehab Center of Reform, Inc., and The Medical Clinic Board of the City of Reform, Alabama, on bonds issued May 1, 1995. (Doc. 19, p. 3).  In response to the alleged default, Plaintiff filed the instant lawsuit. (Doc. 19).  Plaintiff's motion for summary judgment seeks for the court to:

> (1) find that Events of Default have occurred and are continuing to occur under the Bond Documents;
>
> (2) enter a final judgment jointly and severally against The Medical Clinic Board of the City of Reform, Alabama, and Salem Nursing & Rehab Center of Reform, Inc.;

(3) appoint Derek Pierce of Healthcare Management Partners, LLC as receiver over the Property;

(4) direct Salem Nursing & Rehab Center of Reform, Inc., and AltaCare, on Salem Nursing & Rehab Center's behalf, to provide the Trustee with an accounting for each of Salem Nursing & Rehab Center's fiscal years ending in 2010, 2011, and 2012; and

(5) grant the Trustee leave to prove costs of collection, including attorney's fees and expenses.

(Doc. 43, p. 16).   Defendants have filed a brief in opposition, along with exhibits, and Plaintiff has filed a reply to that brief.   The court has considered the evidence and the arguments set forth by all parties.   The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) (doc. 16).

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(c).   The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).   The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23.   There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'"   Id. at 324 (quoting Fed. R. Civ. P. 56(e)).   The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings.   Celotex, 477 U.S. at 324.   "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(c).   The substantive law will identify which facts are material and which are irrelevant.   Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."   Id. at 249.   His guide is the same standard necessary to direct a verdict:   "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."   Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).   However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts."   Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.   Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).   Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.   Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255.   The non-movant need not be given the benefit of every

4

inference but only of every reasonable inference.   <u>Brown v. City of Clewiston</u>, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## FACTS

For purposes of summary judgment, the facts are as follows.[1]   Plaintiff, The Bank of New York Mellon Trust Company, NA, is the successor in interest to Compass Bank and Chase Manhattan Bank.   Plaintiff is serving as the Indenture Trustee.   Defendant Medical Clinic Board of the City of Reform, Alabama (the "Board"), is the issuer of the bonds giving rise to the instant action.   Defendant Salem Nursing & Rehab Center of Reform, Inc., ("SNRC") is the Board's lessee and the successor in interest to Salem Housing Corporation.   Defendant AltaCare is the current manager of an 85-bed nursing facility, Salem Nursing & Rehab Center of Reform[2] (previously known as the Reform Health Care Center), located in Reform, Alabama (the "Project").   AltaCare is not obligated under the bond documents giving rise to the instant action but, as manager of the Project, asserts an interest in the Project and other collateral and controls the Project's records.

---

[1]   The nonmoving defendants did not include a full statement of facts in response to Plaintiff's motion for summary judgment.   Therefore, Plaintiff's statement of facts will be used for summary judgment purposes, with the exception of any facts that are affirmatively disputed by the defendants.   (Doc. 46, p. 2).

[2]   Salem Nursing & Rehab Center of Reform, referred to as the "Project," is defined in the Indenture and Lease Agreement as the Project Building, the Project Equipment, and the Project Site (each of which also are defined in the documents).   (Doc. 19-1, p. 25; Doc. 19-3, p. 14).

On May 1, 1995, the Board and Compass Bank entered into an Indenture of Trust, to which plaintiff ultimately became Compass's successor in interest.  (Doc. 19-1).  As a part of the agreement, the Board issued bonds to Compass Bank to finance the costs of the acquisition, expansion, and renovation of the Reform Health Care Center.   (Id. at 6).   The Board agreed then to lease the facility to Salem Housing Corporation, a North Carolina non-profit corporation, with the lease proceeds pledged for payment of the bonds.   (Id.)  The Board issued the bonds in two series, a $2,720,000.00, First Mortgage Revenue Bond (the "Series 1995A Bonds"), and a $355,000.00, Taxable First Mortgage Revenue Bond (the "Series 1995B Bonds") (together, the "Bonds"), the aggregate amount totaling $3,075,000.00. (Id.)

The Bonds are governed by (1) the Indenture of Trust dated May 1, 1995 (doc. 19-1), and (2) the First Supplemental Indenture dated September 1, 2000 (doc. 19-2).   To secure the obligations in the Indenture of Trust, the Board executed the Mortgage and Fixture Filing (the "Mortgage") (doc. 19-7) and Security Agreement (doc. 19-5) to the Trustee, as successor in interest to Compass Bank.  The Mortgage grants the Trustee a first priority mortgage lien on the Nursing Home, Project Site (as defined by the Mortgage document), and Revenues (as defined by the Mortgage document).   (Doc. 19-7).

To generate the revenue needed to pay the Bond obligation, the Board entered into a Lease Agreement dated May 1, 1995, (doc. 19-3) with Salem Housing Corporation, in

which Salem Housing Corporation leased the Project from the Board.[3]   The rights of the

Board to payments due pursuant to the Lease Agreement have been assigned to the Trustee,

and the amounts to be paid under the Lease Agreement have been specifically delegated to

the payment of the Bonds.   (Doc. 19-1, p. 9).   Accordingly, the Trustee is empowered to

enforce the rights of the Board under the Lease Agreement.   (Doc. 19-1, § 10.3).   On or

about September 1, 2000, Salem Nursing & Rehab Center of Reform, Inc., ("SNRC") and

the Trustee, as successor in interest to Chase Manhattan Bank and Compass Bank, entered

into an Assumption Agreement under which SNRC assumed all the covenants, conditions,

duties, and obligations of Salem Housing Corporation contained in the Mortgage,

Indenture, and Lease Agreement, including the payments and other obligations set forth in

the Lease Agreement.   (Doc. 19-8).   As a condition of the Assumption Agreement, Salem

Housing Corporation transferred its interest in the Project to SNRC.   (Docs. 19-4, 19-8).

As of November 19, 2012, the Series 1995A Bonds were outstanding in the principal

amount of $2,425,000.00.   (Doc. 43-1 at ¶ 17).

The Bonds are special limited obligations of the Board, payable solely from the

payments made by SNRC under the Lease or, upon an event of default, from the proceeds

derived from the liquidation of the Project and any other personal property covered by the

Mortgage.   (Doc. 19-1, §§ 6.1, 10.3, 10.7; Doc. 19-7, § 2.6; Doc. 43-1 at ¶ 16).   Under

---

[3]   On or about September 1, 2000, the Board and Salem Housing Corporation entered into
the First Supplemental Lease. (Doc. 19-4).   Salem Housing Corporation filed Chapter 11
bankruptcy and the reorganization plan was confirmed by the bankruptcy court on August 31,
2000.   (Doc. 19-4, p. 2).   Under the reorganization plan, the lease of the Project was transferred
to SNRC.   (Id.)

the Lease Agreement, SNRC must pay, as rent, the amounts required by the Lease Agreement in installments that, in the aggregate, are sufficient to pay in full, when due, all the outstanding Bonds, including the total interest due and payable, the total principal amount of the Bonds, and the premium, if any, payable on the redemption of any Bonds. (Doc. 19-4, Art. III).   SNRC is required to operate the Project on a revenue-producing basis, and fix, charge, and collect, or cause to be fixed, charged, and collected, rates, fees and charges sufficient each year to produce Net Revenues Available for Debt Service[4] equal to at least one hundred twenty percent of the Annual Debt Service.   (Doc. 19-3, § 6.7).

In the event of a default under the Lease Agreement, if the Trustee employs attorneys or incurs other expenses in connection with the collection of payments required under the Lease Agreement or the enforcement of performance of any obligations under the Lease Agreement, SNRC is liable to the Trustee for reasonable attorneys' fees and expenses.   (Doc. 19-3, § 10.4).   Events of Default under the Lease Agreement include the failure of SNRC to make payments required under §4.2(a) or (b) and the failure of SNRC to observe and perform any covenant, condition, or agreement under the Lease Agreement. (Doc. 19-3, § 10.1).   Events of Default under the Indenture are defined as, among others:

---

[4]   "'Debt Service Reserve Requirement' means an amount equal to the Maximum Annual Debt Service on each series of the Series 1995A Bonds and the Series 1995B Bonds, unless such amount would be greater than (a) 10% of the face amount of such series, or (b) 125% of the Average Annual Debt Service on such series of Bonds, in which event the Debt Service Reserve Requirement shall be reduced to the lesser amounts described in (a) and (b)."   (Doc. 19-3, pp. 8-9).

(a) the failure of the Board to pay interest on the Bonds when due; (b) the failure of the Board to pay principal on the Bonds when due; (c) default in the performance or observance of any covenant by the Board and the failure to remedy the same after notice; and (d) the occurrence of an Event of Default under the Mortgage or Lease Agreement. (Doc. 19-1, § 10.1).

Upon the occurrence of an Event of Default under the Indenture, the Lease Agreement, or the Mortgage, the Trustee is entitled to the appointment of a receiver over the Property as a matter of right.[5]  (Doc. 19-1, § 10.5; Doc. 19-3, § 10.2(d); Doc. 19-7, § 2.5).   The Lease Agreement provides that, upon the occurrence of an Event of Default, the Trustee may take any action at law or in equity to enforce performance and observance of any obligation, agreement, or covenant of SNRC under the Lease Agreement.   (Doc. 19-3, § 10.2).   The Lease Agreement requires SNRC to provide annually to the Trustee a complete audit report and opinion, certified by an Independent Accountant, containing a balance sheet, income statement, results of operations, and statement of cash flows at the end of each fiscal year.   (Doc. 19-3, § 6.5(a)).   Neither SNRC nor AltaCare, on SNRC's behalf, has provided the Trustee with the required audit report for the fiscal years ending in 2010, 2011, or 2012.   (Doc. 43-1 at ¶ 38; Doc. 43-2, 153:8-15, 154:21-155:2).

---

[5]   Section 10.2(d) of the Lease Agreement allows the Trustee to "[f]oreclose on its liens under the Mortgage and the Security Agreement and take any other action or remedy specified in the Mortgage and the Security Agreement.   Section 2.5 of the Mortgage allows for the appointment of a receiver as a matter of "strict right."

9

### I.  Payment Default under the Indenture

The Board has failed to make the payments to the Trustee required under §§ 3.6(b) and (c) of the Indenture.   Those required payments consist of:

> (a) Seventy Thousand Dollars ($70,000.00) on or before May 1, 2009, in order to redeem those Series 1995 Bonds maturing on that date;
>
> (b) Seventy-five Thousand Dollars ($75,000.00) on or before May 1, 2010, in order to redeem those Series 1995 Bonds maturing on that date;
>
> (c) Eighty Thousand Dollars ($80,000.00) on or before May 1, 2011, in order to redeem those Series 1995 Bonds maturing on that date; and
>
> (d) Eighty-Five Thousand Dollars ($85,000.00)[6] on or before May 1, 2012, in order to redeem those Series 1995 Bonds maturing on that date.

(Doc. 19-1, §§ 3.6(b), 3.6(c)).   The Board has failed to make the payments to redeem the Bonds maturing in 2010, 2011, or 2012.   The Board also has failed to pay the required semiannual installments of interest, of $105,495.63 each, on the Bonds due for payment on and after November 1, 2009.   (Doc. 43-1 at ¶¶ 19-20).   As of November 15, 2012, the Board has failed to cure the defaults described above.   (Id. at ¶ 21).

The Trustee is owed the following sums on the Bonds: unpaid principal and interest, interest due on unpaid and overdue interest, and interest due on unpaid and overdue principal.   Interest continues to accrue at the Late Payment Rate of $669.65 per day. (Doc. 43-1 at ¶ 24).   There is a dispute of fact as to the amounts owed.   Specifically,

---

[6]   Plaintiff's Motion for Summary Judgment claims that $85,000.00 was due on or before May 1, 2012.   (Doc. 43, p. 8).   However, the original Indenture lists $90,000.00 as the amount payable on May 1, 2012.   (Doc. 19-1 § 3.6(c)).

Defendants contend that there exists $305,053.13, of acknowledged "on hand" funds being held by the Plaintiff/Trustee which should be applied as a credit against alleged payment due on the Bonds.   (Doc. 46, p. 1).   This arrangement was discussed in a "payoff letter" sent by Plaintiff to Defendants on December 6, 2012.   (Doc. 46-2, p. 2).   Also, Defendants contend that the Plaintiff has not presented sufficient proof of its claimed expenses and the reasonableness of those expenses, specifically the reasonableness of attorney's fees claimed as expenses of the Trustee.

## II.   Payment Default Under the Lease Agreement

The last lease payment received by the Trustee on behalf of SNRC was in the amount of $178,426.88 on or about May 1, 2009, and the Trustee has not received any lease payments since.   (Doc. 43-1 at ¶ 26; see also Doc. 43-2, 53:16-20; 144:22-147:20).   These missed payments have resulted in Events of Default as defined in the Lease Agreement.   (Doc. 19-3, § 10.1(a); Doc. 43-1 at ¶¶ 26-27).   The Indenture provides that the failure of SNRC to make payments to the Trustee as provided in the Lease Agreement also is an Event of Default under the Indenture.   (Doc. 19-1, § 10.1(d)).   As of November 15, 2012, SNRC owed $1,121,266.79 as a result of unpaid lease payments.   (Doc. 43-1 at ¶ 28).

## III.   Covenant Defaults Under the Indenture and Lease Agreement

Covenant Defaults under § 10.1(c) of the Indenture ripen into Events of Default if the Covenant Default is not cured within 30 days of receipt of notice through first class mail.   (Doc. 19-1, § 10.12(d); Doc. 19-3, § 10.1(b); Doc. 43-1 at ¶ 48).   The Trustee

provided SNRC with notice of the Covenant Defaults and, as of January 4, 2013, SNRC had failed to cure the Covenant Defaults.[7]   (Doc. 43-1 at ¶¶ 46-47).

## A. Repair and Replacement Fund Default

Pursuant to the Lease Agreement, the Repair and Replacement Fund is required to maintain a balance of $40,000.00[8].   (Doc. 43-1 at ¶ 29).   If the Repair and Replacement Fund falls below $40,000.00, SNRC is required to make monthly deposits of $2,200.00, until the amount is restored.   (Doc. 19-3, § 4.2(d)).   As of November 15, 2012, the Repair and Replacement Fund had a balance of $23,626.90, and SNRC had failed to make any payments as required by the Lease Agreement.   (Doc. 43-1 at ¶¶ 30-31).

## B.   Audited Financial Statement Default

Under the Lease Agreement, SNRC is required to provide the Trustee with audited balance sheets, income statements, and results of operations on an annual basis.   (Doc. 19-3, § 6.5(a)).   As of November 15, 2012, SNRC had failed to provide the required documents for fiscal years ending June 30 of 2010, 2011, and 2012.   (Doc. 43-1 at ¶ 38;

---

[7]   Plaintiff's Motion for Summary Judgment claims that notice was served on October 18 and October 31 of 2012, and uses the affidavit of Bridget M. Schessler, the Vice President for The Bank of New York Mellon Trust Company, as evidence of the fact.   However, none of the exhibits cited to within the affidavit is included in the Plaintiff's filing, and the affidavit does not provide the dates on which notice was served.   Therefore, the court will not construe the dates of notice to be undisputed facts because they are not supported by evidence.

[8]   Plaintiff cites to § 6.9 of the Indenture, presumably to cite the required balance of the Repair and Replacement Fund.   However, the page upon which § 6.9 of the Indenture is located was not filed as part of the record, and thus will not be considered by the court as evidence.

Doc. 43-2, 153:8-15, 154:10-17; Doc. 43-3, 81:5-9 (stating he is unaware of whether audits were done)).

### C.   Rate Covenant Default

Under the Lease Agreement, SNRC is required to set its rates at levels that will generate revenues sufficient to meet SNRC's obligations under the Lease Agreement. (Doc. 19-3, § 6.7).  If SNRC is not generating sufficient revenue to meet its obligations under the Lease Agreement, it is required to employ independent accountants or consultants to examine its operations.  (Id.)  As of November 15, 2012, despite its payment defaults, SNRC had not hired independent accountants or consultants as required by the Lease Agreement.   (Doc. 43-2, 161:6-4; see also Doc. 43-1 at ¶ 40 (stating that the Trustee has not been informed of the hiring of independent accountants or contractors by SNRC)).

### D.   Intercompany Loans

SNRC is not permitted under the Lease Agreement to make intercompany loans until it has fulfilled all of its monthly obligations under the Lease Agreement.   (Doc. 19-3, § 6.13).   However, SNRC's audited financial statements for the fiscal year ending June 30, 2009, show a Current Asset labeled "Intercompany" in the amount of $1,375,740.00. (Doc. 43-1 at ¶ 42).   SNRC's unaudited financial statements and Medicare and Medicaid Cost Reports for fiscal years ending June 30 of 2010, 2011, and 2012, each reflect accounting entries that appear to represent the Current Asset labeled "Intercompany." (Doc. 43-1 at ¶ 43).   Because SNRC has not made the payments required under the Lease

Agreement since at least May 2009, it was not permitted to make intercompany loans after that date (presuming SNRC met its obligations in May 2009).   (Doc. 19-3, § 6.13).

### E.   Working Capital Default

Pursuant to the Lease Agreement, SNRC is required to maintain working capital in the amount of at least Two Hundred Fifty Thousand Dollars ($250,000.00).   (Doc. 19-3, § 6.10).   As of November 15, 2012, SNRC did not have the required amount of working capital.   (Doc. 43-2, 177:21-178:7, 193:22-194:10; Doc. 43-1 at ¶ 45).

### IV.   Defaults Under the Medical Clinic Board Mortgage

An Event of Default under either the Indenture or the Lease Agreement constitutes an Event of Default under the Mortgage.   (Doc. 19-7, § 2.1(d)).   Because undisputed Events of Default have occurred and continue to occur, under both the Indenture and the Lease Agreement, as set forth, *supra*, an Event of Default has occurred and continues to occur under the Mortgage.   (Doc. 19-7, § 2.1(d); Doc. 43-1 at ¶ 50).

### DISCUSSION

Summary judgment is appropriate in a breach of contract action where the contract is unambiguous and the facts undisputed.   Nunnelley v. GE Capital Information Technology, 730 So. 2d 238, 241 (Ala. Civ. App. 1999) (citing Gabrielson v. Healthcorp of Eufaula, Inc., 628 So. 2d 411, 415 (Ala. 1993)).   In Defendants' Response to Plaintiff's Motion for Summary Judgment, Defendants dispute only two of Plaintiff's assertions. First, Defendants argue that there is $305,053.13 of "on hand" funds being held by Plaintiff

that should be applied as a credit against the payment due on the Bonds.   Defendants argue that this dispute as to whether the damages, as alleged, are accurate constitutes a question of material fact that precludes summary judgment.   Defendants claim that the dispute illustrates that Plaintiff cannot conclusively prove every element of its claim, and, therefore, summary judgment is inappropriate.   Defendants also dispute the Plaintiff's calculation of Trustee's fees and expenses, claiming that "[w]ithout a breakdown of the fees and expenses, it is impossible for these Defendants (and this Court) to determine whether the fees and expenses incurred are, in fact, reasonable."   (Doc. 46, p. 5).

Although the court agrees that questions remain as to the amount of damages to which Plaintiff is entitled and the amount of Trustee fees and expenses that are reasonable, these questions do not preclude summary judgment in favor of the moving party on questions of liability for breach of the Indenture and Lease Agreement, and for forms of relief not related to the actual amount of money damages.   The undisputed evidence presented by Plaintiff establishes that Defendants entered into the agreements herein willingly and have defaulted on these agreements, and have remained in default for over four years, as set out by Plaintiff in the motion for summary judgment.   The evidence establishes that Defendants are liable to Plaintiff, although the amount of liability remains in question.   Defendants have offered no evidence to dispute Plaintiff's claim.   Because there is no issue of material fact, summary judgment is appropriate as to finding the Defendants liable to the Trustee, as well as the Trustee's entitlement to relief such as the appointment of a receiver and other equitable relief..

15

## <u>CONCLUSION</u>

Premised on the foregoing, Plaintiff's motion for summary judgment is due to be GRANTED.   By separate Orders, the court will GRANT summary judgment to the Plaintiff on the liability of the Defendants, and will order the appointment of a receiver to take over the operations of the Project nursing home, and will order the Defendants to make an accounting to the Plaintiff for all funds, revenues, and expenditures since May 1, 2009.   The court reserve to a later time the determination whether the plaintiff is entitled to a money judgment for damages.

DONE this 18th day of March, 2014.


T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE